**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

CARL BAHAM                                          CIVIL ACTION

VERSUS                                                  NO. 19-2418

DARREL VANNOY                            SECTION: "H"(3)

### REPORT AND RECOMMENDATION

Petitioner, Carl Baham, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, his application should be **DISMISSED WITH PREJUDICE**.

On February 26, 2014, petitioner was convicted under Louisiana law of one count of attempted second degree murder and two counts of illegal use of a firearm.[1] On March 6, 2014, he was sentenced to a term of fifty years imprisonment on the attempted murder conviction and to a concurrent term of twenty years imprisonment on the first of the two firearm convictions. He was then also sentenced to an additional consecutive term of ten years imprisonment on the second firearm conviction. It was ordered that all of his sentences be served without benefit of probation, parole, or suspension of sentence.[2] The Louisiana Fifth Circuit Court of Appeal affirmed his convictions and sentences,[3] and the Louisiana Supreme Court denied his related writ application.[4]

---

[1] State Rec., Vol. 4 of 13, transcript of February 26, 2014, pp. 8-9; State Rec., Vol. 1 of 13, minute entry dated February 26, 2014; State Rec., Vol. 1 of 3, jury verdict forms.
[2] State Rec., Vol. 1 of 13, transcript of March 6, 2014; State Rec., Vol. 1 of 13, minute entry dated March 6, 2014.
[3] State v. Baham, 169 So. 3d 558 (La. App. 5th Cir. 2015); State Rec., Vol. 3 of 13.
[4] State v. Baham, 190 So. 3d 1189 (La. 2016); State Rec., Vol. 12 of 13.

On or about December 19, 2016, petitioner filed an application for post-conviction relief with the state district court,[5] and that application was later denied.[6] His related writ applications were then likewise denied by the Louisiana Fifth Circuit Court of Appeal[7] and the Louisiana Supreme Court.[8]

While those post-conviction proceedings were ongoing, petitioner returned to the state district court to file a motion to vacate an illegal sentence on or about February 12, 2018.[9] That motion was also denied.[10] The Louisiana Fifth Circuit Court of Appeal then denied his related writ application,[11] and he did not seek further review by the Louisiana Supreme Court.

Petitioner thereafter filed the instant federal application seeking habeas corpus relief.[12] The state has filed a response opposing petitioner's claims but not challenging the timeliness of his application.[13]

## I. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the

---

[5] State Rec., Vol. 7 of 13.
[6] State Rec., Vol. 8 of 13, Order dated March 13, 2017.
[7] Baham v. Vannoy, No. 17-KH-238 (La. App. 5th Cir. May 18, 2017); State Rec., Vol. 9 of 13.
[8] State ex rel. Baham v. State, 254 So. 3d 683 (La. 2018); State Rec., Vol. 13 of 13.
[9] State Rec., Vol. 8 of 13.
[10] State Rec., Vol. 8 of 13, Order dated February 21, 2018.
[11] State v. Baham, No. 18-KH-493 (La. App. 5th Cir. Oct. 15, 2018); State Rec., Vol. 11 of 13.
[12] Rec. Doc. 4.
[13] Rec. Doc. 12.

merits by the state court), cert. denied, 140 S. Ct. 2676 (2020).  The applicable standards of review are now as follows.

As to pure questions of fact, factual findings are presumed to be correct and a federal court must give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held:  "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  White v. Woodall, 572 U.S. 415, 426 (2014).  However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); Langley, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted).  "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to

> extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.    AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – *and federal courts* – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added).  The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein.  Woodall, 572 U.S. at 417.

## II.  Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this case as follows:

> On July 25, 2013, at approximately 4:00 P.M., Byron Matthews, Jr. picked up his children, a two-year-old boy and a five-month-old girl,[FN 1] from a daycare facility and drove them to his mother's house at 1616 Apache Drive, an apartment complex in Marrero.  Matthews' son was seated in the rear driver's side seat, and his daughter was seated in the rear passenger's side seat.  When Matthews arrived at his mother's residence, he brought his car to a stop on the curb in front of the door.  Matthews exited his car and walked around the front to the rear passenger's door.  He was about to unbuckle his daughter's seat belt when he saw somebody with a gun exit a black Nissan.  Matthews made eye contact with that individual and then walked around, got back inside of his car, and started it.  At that time, he heard gunshots.

5

[FN 1] At sentencing, the trial court refers to the little girl being four months old.

When Matthews realized that his car had been hit, he backed up, turned the car around, put his foot on the brake, and "hopped" toward the back seat to cover his daughter.[FN 2]   Matthews then went to the main office of the apartment complex.  When he arrived, he looked in the back seat and saw blood and his son pointing toward his face.  He put his son in his lap and drove to Ochsner Hospital on the Westbank.[FN 3] Matthews pulled up to the hospital and told two nurses that his son had been shot.  The nurses grabbed his children and took them inside for medical treatment.[FN 4]

[FN 2] Matthews testified that he could not cover both children, and decided to cover his younger daughter.

[FN 3] Deputy Sabrina Howard of the Jefferson Parish Sheriff's Office ("JPSO") testified that on July 25, 2013, she was dispatched to 1050 Manhattan in response to illegal gunfire in the area.  The shots were close to where the shooting in this case occurred.  She received additional information that a black male in a silver Ford Focus was travelling at a high rate of speed on Tensas Drive.  It was later determined that the black male was Matthews who was taking his son to the hospital.

[FN 4] Matthews also testified he had prior convictions for purse snatching, burglary of a residence, misdemeanor "carnal knowledge," and misdemeanor "resisting."  He further testified that he was currently in jail on the purse snatching conviction.

Matthews told the police that he did not know the individual who shot at him.  He identified defendant as the shooter in a photographic lineup and in court during the trial.  Matthews testified that he did not have an AK-47 in his car when he picked up his children, nor did he shoot an AK-47 next to the car where his children were present.  He did not shoot anyone that day.  Matthews further testified he has never owned a firearm.

JPSO Deputy William Boersma was dispatched to Ochsner Hospital in connection with a shooting.  Deputy Boersma met with Matthews who told him what had happened.  Matthews gave the police permission to search inside of his car.  Deputies examined Matthews' vehicle and observed a bullet hole in the rear driver's side door where a bullet had apparently gone through and struck Matthews' son in the face.  Matthews told the deputies that the bullet hole was not there previously.  One projectile and a child's tooth were found inside the vehicle.

JPSO Deputy Jerry Pettit went to the crime scene and found four fired cartridge casings on Apache Street and two projectiles on the "other side of the gate."[FN 5]

[FN 5] Elizabeth King of JPSO, an expert firearms and tool marks examiner, testified that the four fired cartridge cases were fired from the same unknown

firearm, but not by the 9 mm Bryco pistol recovered from Joshua Hawkins. She testified one weapon fired the four spent casings and one weapon fired the two recovered projectiles; however, she could not link the casings and the projectiles because she did not have the firearm. King testified that a Taurus could have fired the projectiles. She also testified that the evidence she looked at and the analysis she conducted were consistent with there being one firearm used in this case. She further testified she was familiar with AK-47 rounds and weapons and there is no way to confuse a 9 mm round with an AK-47 round.

The day after the incident, JPSO Detective Sergeant Eddie Klein obtained information that a subject by the nickname of "Dooney" was responsible for the shooting and subsequently determined that defendant went by that nickname. Additionally, Matthews' description of the suspect vehicle matched a vehicle associated with defendant, namely, a black Nissan. Detective Klein presented a photographic lineup to Matthews, after which Matthews positively identified defendant as the perpetrator.

Sgt. Klein and another deputy went to defendant's residence at 6144 Ray Street in Marrero, knocked on the door, and defendant and Joshua Hawkins walked outside. Deputies conducted a safety pat down on defendant and Hawkins and found a 9 mm handgun in Hawkins' right front pocket. A search warrant was then obtained for defendant's residence. During that search, JPSO recovered the following: a box containing five 9 mm TulAmmo Luger rounds from a drawer of a dresser located in the rear bedroom; a Taurus 9 mm magazine model 24/7 with a 15 round capacity on top of a dresser in the room to the right of the kitchen; a .380 auto cartridge in a container in that same room; and cell phones. The ammunition was the same brand and caliber as the shell casings found at the scene.

Defendant was brought to the detective bureau to Captain Dennis Thornton for interrogation. Defendant was advised of his rights via a waiver of rights form. After defendant initialed next to his rights and waived them, he gave three different statements. When the initial questioning started, defendant said in his first statement that he could not provide any information and that he was not present at the scene where the shooting occurred. Defendant then changed his story, admitted he lied, stated he was present at the scene, and agreed to give an audiotaped statement reflecting those changes.

In his first recorded statement dated July 26, 2013, at 6:06 P.M., defendant said he took Stephanie Taylor, his girlfriend, and their baby to the apartment complex in Harvey and brought them upstairs. Defendant walked downstairs, got into his vehicle, and saw a black Dodge Charger with tinted windows turning off from Manhattan. The Charger then pulled on the side of him, and a passenger dressed in black exited the vehicle, pulled a gun out from under his shirt, and fired multiple shots hitting his vehicle, a black Nissan. The Charger pulled off, and the passenger was still firing. Defendant stated that he did not carry a gun, he did not fire a gun back at them to protect himself, and he never had a gun at all. He denied shooting at the other vehicle. Defendant also stated that when he returned to his house, he checked his car and it had bullet holes in the back by the trunk.

Defendant said that he did not call the police because he was scared since people were saying that the black Nissan did the shooting. He also said that he did not see a baby at the scene, just a man "standing out there," who was "minding his own business." The man "looked like he was doing something with somebody else or something." After he arrived home, defendant's girlfriend called and asked if he was alright because she heard the gunshots. Defendant stated that his girlfriend did not see anything because she was inside.

The police investigated defendant's story in an attempt to corroborate defendant's facts and officers were ordered to contact defendant's girlfriend, Taylor. Captain Thornton testified that Taylor made several statements that were inconsistent with those made by defendant. As a result, he decided to question defendant again. Defendant admitted he had been untruthful about the black Dodge Charger and gave another statement.

In his second recorded statement dated July 26, 2013, at 9:11 P.M., defendant said that he brought his family upstairs and put his baby down on the stairs. He saw a man looking at him and "shaking his head just looking at me like this. Like he knew me from somewhere, but I don't —, I never seen him before." Defendant stated that the man made eye contact with him. Defendant went back to his vehicle and started to get in. The man then went to the passenger side of his vehicle and unlocked the door.[FN 6]  As defendant was getting in his car, he wondered why the man was unlocking his door. The man came out of his vehicle with an AK-47, lifted it, and said, "What's up now?," after which defendant started firing shots.

> [FN 6] Defendant stated that the man had a "blue" "little wagon car," like a station wagon.

Defendant stated that he had a 9 mm gun in his car under the seat and he did not take his gun out until the other man pulled out the AK-47, but did so because he feared for his life. He said that his daughter was right there by him and that his girlfriend was standing by the steps and she was scared. Defendant stated that he fired four or five times and the man fired three to six times. Defendant said he later saw on the news that a baby was shot, and Taylor called and told him that he shot a baby. Defendant stated he did not see a baby in the vehicle. He did not see the man put the baby in the car so he thought that the baby must have already been in the car. Defendant thought the man probably made a mistake and hit the baby.

Defendant explained he had a gun for protection because he was previously shot multiple times. He said he threw the gun out of the window when he was leaving the scene and he had no idea where it might be. He apologized and said he never meant to shoot a child.

Captain Thornton testified that there were no AK-47 casings or projectiles anywhere at the scene. Also, the officers did not find any strike marks or bullet holes on any of the houses or other cars in the area. Further, the officers did not find any evidence to show that defendant shot in self-defense. Captain Thornton

testified that at this point in the investigation, an application for defendant's arrest was drawn up and subsequently, an arrest warrant was issued.

Taylor testified that on July 25, 2013, she and defendant were at his residence. At some point, she, defendant, and their baby got into defendant's mother's car, a black Nissan Sentra, and defendant drove them to Taylor's mother's residence at 1000 Tensas Drive, Apartment C, in Harvey. When they arrived, Taylor exited the vehicle, and she and defendant talked. She was standing by the stairs not far from defendant, and defendant was on the driver's side of the vehicle. Taylor then heard defendant say, "Do you know me?" to someone in the area; however, she could not see anyone. Defendant then grabbed a gun, told her to "step back," pushed her back, and started shooting multiple times. She ran upstairs and went inside the residence, and defendant drove away.

Taylor testified she could not see what the other person was doing or whether that person had a gun because she was on the "other side." She testified that before defendant pulled out a gun and started shooting, no one shot at him first. She did not see anyone outside with a gun except for defendant and she did not see a black Dodge Charger drive up or a person dressed in black get out of a black Dodge Charger. She also testified the bullet holes in defendant's black Nissan were there before this shooting. She testified that defendant's vehicle was previously shot up.

Taylor testified that when she and defendant spoke on the phone later on, she told him a child was shot, and defendant replied that he did not see a child. Defendant told her that he knew there was someone else outside, but he didn't know it was a child. During that phone conversation, defendant did not say anything about anyone pulling a gun on him or shooting at him, nor did he say anything to her about having recognized anyone or anything about self-defense. Taylor recounted an incident on August 7, 2011, wherein defendant was walking her home, and a group of men jumped out and shot defendant three times.[FN 7] She also recounted another incident on April 21, 2013, wherein a drive-by shooting occurred at defendant's residence and multiple gunshots were fired at defendant's house. She testified that she was present during both incidents.

> [FN 7] The State and the defense stipulated that on August 7, 2011, Deputy Wayne Aguillard responded to a report of gunshots at defendant's residence. When Deputy Aguillard arrived, he learned that a fight had broken out between defendant and another individual, defendant had been shot three times, and defendant also reported several unknown black males approached him as he was shot. The State and the defense further stipulated that Brendel Dorsey was arrested in connection with that shooting, the district attorney's office never filed charges against Dorsey, and none of the additional aggressors were identified.

Shantell Baham testified defendant was her son and he had lived with her his entire life. Ms. Baham testified that on April 21, 2013, approximately three months before this shooting, she was home alone that night in her house at 6144 Ray Street. At some point, she heard two car doors slam, after which she heard

gunshots.  Ms. Baham testified that it sounded like knocking on the door, but she knew it was not knocking because she could smell burnt residue from the sheetrock. She further testified that bullets came into her house and hit her vehicle, the black Nissan.  Ms. Baham did not see who shot her house.[FN 8]

> [FN 8] Deputy Clinton Williams testified that he responded to the call on April 21, 2013, regarding gunshots being fired, after which he found shell casings on the road in front of the house at 6144 Ray Street, a total of twenty-four 7.62 rounds which were consistent with an AK-47.[14]

### III.  Petitioner's Claims[15]

### A.  Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective for failing to lodge the following objections:

1.  "Trial counsel failed to lodge a contemporaneous objection when the prosecution, <u>during voir dire examination</u>, told prospective jurors that Applicant would <u>not</u> cooperate with the attempted murder investigation which infringed on his Fifth Amendment Right to remain silent."[16]

2.  "Trial counsel failed to lodge a contemporaneous objection when the prosecution, <u>during opening statements</u>, told jurors that police reports and other documents (in his office) reveal that Applicant was guilty of the crime charged."[17]

3.  "Trial counsel failed to lodge a contemporaneous objection when the prosecution, <u>during closing arguments</u>, told jurors that although he could <u>not</u> prove it, he believed Applicant was a serial child molester."[18]

---

[14] <u>State v. Baham</u>, 169 So. 3d 558, 561-65 (La. App. 5th Cir. 2015); State Rec., Vol. 3 of 13.
[15] Although petitioner's claims are addressed herein in a different order than they were listed in his federal application, all of his claims are discussed.
[16] Rec. Doc. 4, p. 27.
[17] <u>Id.</u>
[18] <u>Id.</u> at p. 28.

4.  "Trial counsel failed to lodge a contemporaneous objection when the prosecution solicited false testimony from the alleged victim regarding the interview and statement allegedly given to the district attorney's office surrounding the alleged attempted murder investigation."[19]

5.  "Trial counsel failed to lodge a contemporaneous objection when the prosecution (during trial) vouched for the credibility of the investigating detectives when he stated that documents from the Jefferson Parish Sheriff's Department and Internal Affairs Division reveal that the detectives were in good standing with no disciplinary infractions."[20]

6.  "Trial counsel failed to lodge a contemporaneous objection on the Trial Court's failure to charge jurors as to the law applicable to the facts of the case."[21]

Petitioner asserted the foregoing ineffective assistance of counsel claim in his first state post-conviction application.[22]   The state district court denied the claim, holding:

> All of the petitioner's claims argue that he received the ineffective assistance of counsel at trial.   Important precedents address the issue.   Under the well-known standard set forth many years ago in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and State v. Washington, 491 So.2d 1337 (La. 1986), a conviction must be reversed if the petitioner proves (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect.   State v. Legrand, 2002-1462 (La. 12/3/03), 864 So.2d 89.
> To be successful in arguing a claim of ineffective assistance of counsel, a post-conviction petitioner must prove deficient performance to the point that counsel is not functioning as counsel within the meaning of the Sixth Amendment. A petitioner must also prove actual prejudice to the point that the results of the trial

---

[19] Id.
[20] Id.
[21] Id. at p. 29.
[22] State Rec., Vol. 7 of 13.

cannot be trusted. It is absolutely essential that both prongs of the <u>Strickland</u> test be established before relief will be granted by a reviewing court.

In addition, there is a strong presumption that counsel's performance is within the wide range of effective representation. Significantly, effective counsel does not mean errorless counsel and the reviewing court does not judge counsel's performance with the distorting benefits of hindsight, but rather determines whether counsel was reasonably likely to render effective assistance. <u>State v. Soler</u>, 93-1042 (La.App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075.

In considering allegations that are related to trial strategy, the Supreme Court of Louisiana has noted that:

> Further, failure of trial counsel to adequately question alibi witnesses, properly investigate the case, make an opening statement, have defendant take the stand, request particular special charges, and object to certain questions asked of witnesses at trial are all claimed to clearly show that defendant was not adequately and effectively represented at the trial. We do not agree. These charges are either leveled at decisions made by counsel during the heat of trial, the correctness of which cannot be determined by hindsight, or the validity of which is not evident from the record.
>
> <u>State v. Strahan</u>, 325 So.2d 231 (La. 12/8/1975).

After reviewing controlling case law, the court will turn to the specific claims raised by the petitioner.

It is important to note that on direct appeal, the petitioner alleged ineffective assistance of counsel at trial, specifically arguing his attorney was ineffective by failing to call him as a witness. The Fifth Circuit noted that the usual practice was to raise such an issue in a post-conviction proceeding but that where the record contains sufficient information, in the interest of judicial economy, the issue may be taken up. <u>Baham</u> at 565. The Court of Appeal on direct appeal considered but rejected the petitioner's argument of ineffective assistance of counsel at trial, making the following factual finding:

> First, defendant would have very little credibility had he testified to a fourth version of events. Second, defense counsel was able to raise a self-defense claim through defendant's statements without defendant's testimony. Defense counsel was able to show, through the testimony of defendant's mother, that defendant had reason to be fearful of being shot because of the drive-by shooting at her home three months prior. Additionally, defense counsel argued self-defense during his closing argument, and the court instructed the jury on self-defense. Third, even if defendant had testified, his testimony would have been contradicted with testimony indicating

that only one gun was used at the scene, that there was no gun in
Matthews' vehicle when it was searched after the shooting, no one
reported seeing Matthews throw a gun from his vehicle on the way
to the hospital, and no one reported finding an AK-47 on the ground.

Baham at 569.

As to Claim One, that trial counsel failed to object during voir dire to the
prosecutor's remark that the defendant failed to give a statement to investigating
detectives, the court finds that this claim is totally unsupported by any
documentation. Absent a transcript, the court cannot determine what remark was
made. Neither counsel at trial or appeal nor the petitioner himself, in connection
with his direct appeal, requested that this portion of the trial be transcribed.

The court is unable to determine what the prosecutor actually said and for
this reason, cannot review the merits of the claim. The claim is speculative. The
court finds that neither prong of the Strickland test has been established. The court
further finds that the petitioner has not met his burden of proof under controlling
post-conviction relief statutes.

As to Claim Two, that defense counsel was deficient by failing to object
during opening statement to the prosecutor's claim that he had reports and other
documents that revealed the petitioner was guilty, relief is unwarranted. As in the
previous claim, no transcript is attached. The court cannot evaluate the alleged
remark from the bare claim made in the petitioner's application. The claim is
unproven.

As to Claim Three, that his attorney was deficient by failing to object to the
prosecutor's remark that police information established that petitioner was a child
molester, relief is unwarranted. The state attaches the transcript of the closing
argument. There is simply no statement anywhere in closing, by either prosecutor,
alleging or insinuating that the petitioner was a child molester. This claim is thus
not only unsupported but actually contradicted by the evidence.

As to Claim Four, that his attorney failed to object when the prosecutor
vouched for the credibility of the detectives, relief is not warranted. The petitioner
argues that the prosecutor stated that the detectives were in good standing and had
no disciplinary infractions. For one thing, there is no legal argument on how, if
true, such a remark would prejudice the defendant's case. More importantly, this
claim is unsupported by proof, despite the fact that the transcript is in the record.

As to Claim Five, that counsel was deficient by failure to object to a lack of
a jury instruction as to the law applicable to the facts of the case, relief is
unwarranted. In fact, the trial court DID instruct the jurors on the law and proof of
this information is in the record. There is no showing of any potential error for
which defense counsel should have objected. This claim is contradicted by the
record.

....

13

As to his final claim, that defense counsel was deficient by failing to object to the prosecutor's soliciting of false testimony, relief is not warranted. Although the trial transcript is in the record, the petitioner fails to point to the allegedly false testimony. This claim is utterly unsupported.

Conclusion

Under the clear language of LSA-C.Cr.P. art. 930.2, the petitioner in an application for post-conviction relief shall have the burden of proving that relief should be granted. Furthermore, both prongs of the <u>Strickland</u> standard must be established before relief will be granted on claims of ineffective assistance of counsel. In the instant application, the petitioner has not met his heavy burden on his claims.

The record establishes that petitioner had the competent assistance of counsel in a fair trial with reliable results. He has had thorough judicial review of his conviction and sentence. The court will deny post-conviction relief. [23]

The Louisiana Fifth Circuit Court of Appeal then likewise denied petitioner's related writ application, holding:

Relator, Carl Baham, seeks review of the district court's denial of his application for post-conviction relief, in which he raised numerous allegations of ineffective assistance of counsel.

Under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution, a defendant is entitled to effective assistance of counsel. To prove ineffective assistance of counsel, a defendant must show that defense counsel's performance was deficient and that the deficiency prejudiced him. An error is considered prejudicial if it was so serious as to deprive the defendant of a fair trial, or a trial whose result is reliable. To prove prejudice, the defendant must demonstrate that, but for counsel's unprofessional conduct, the outcome of the trial would have been different. <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); <u>State v. Casimer</u>, 12-678 (La. App. 5 Cir. 3/13/13), 113 So.3d 1129, 1141.

We have reviewed relator's allegations of ineffective assistance of counsel and agree with the district court's determination that relator failed to meet his burden of proof as set forth in <u>Strickland v. Washington</u>, *supra*. Specifically, in both this writ application and in his application for post-conviction relief, relator alleged that trial counsel was ineffective in failing to contemporaneously object to various statements made by the prosecutor during voir dire examination, opening

---

[23] State Rec., Vol. 8 of 13, Order dated March 13, 2017. In quoting from both the district court's opinion and the Court of Appeal's opinion herein, the undersigned has omitted the discussions concerning one ineffective assistance of counsel contention petitioner asserted in state court (namely that counsel was ineffective for failing to file a motion for post-judgment verdict of acquittal) because that contention is not reasserted in his federal application.

14

statements, and closing arguments.   Relator also asserted that counsel was ineffective in failing to object during trial when the prosecutor vouched for the credibility of the detective.  As noted by the district court in its order denying relief, these claims are either speculative and unsubstantiated by defendant or unsupported by the record.

In another claim, relator alleged that counsel was ineffective in failing to object to a lack of jury instructions as to the law applicable to the facts of this case. As noted by the district court, the record reflects that the jury did receive appropriate jury instructions as to the applicable law.

….

Accordingly, since relator failed to prove deficient performance and resulting prejudice, we find no error in the district court's denial of relator's application for post-conviction relief, which was based on allegations of ineffective assistance of counsel.[24]

The Louisiana Supreme Court thereafter also denied relief, stating simply:   "Denied. Relator fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[25]

Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting such a claim on the merits unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two

---

[24] Baham v. Vannoy, No. 17-KH-238 (La. App. 5th Cir. May 18, 2017); State Rec., Vol. 9 of 13.
[25] State *ex rel.* Baham v. State, 254 So. 3d 683 (La. 2018); State Rec., Vol. 13 of 13.

questions are different.  For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  <u>Ibid</u>.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citation omitted).   The Supreme Court then explained:

> Surmounting <u>Strickland</u>'s high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult.  *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

Id. at 105 (emphasis added; citations omitted). Therefore, on habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted). For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to any aspect of petitioner's ineffective assistance of counsel claim.

As the state courts correctly held, Strickland is the clearly established federal law governing such claims, and it requires that a petitioner make *two* showings: (1) counsel's performance was deficient *and* (2) counsel's deficient performance resulted in actual prejudice to the petitioner. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the deficiency prong of the Strickland test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

As noted, petitioner's first two contentions are based on counsel's purported failure to object to improper comments allegedly made by the prosecutor during voir dire and opening statements.[26] However, as the state court correctly found, petitioner simply did not establish that the comments in question were in fact made. That is fatal. A petitioner bears the burden of proof, and, therefore, he "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). Where, as here, a petitioner has not offered *any* evidentiary support for the factual allegations on which his contentions are founded, his contentions necessarily fail.

---

[26] Rec. Doc. 4, p. 27. Petitioner alleges that, during voir dire, the prosecutor made a comment which improperly referenced the fact that petitioner elected to remain silent. See, e.g., Griffin v. California, 380 U.S. 609, 615 (1965) ("[T]he Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids … comment by the prosecution on the accused's silence …."). Petitioner further alleges that, during opening statements, the prosecutor improperly stated that he had other evidence of petitioner's guilt which, one presumes, the prosecutor did not intend to introduce at trial. See, e.g., State v. Smith, 554 So. 2d 676, 680-81 (La. 1989) ("[A] prosecutor in Louisiana (as well as in almost all other American jurisdictions) is prohibited from intentionally referring to, or arguing on the basis of, facts outside the record, whether at trial or on appeal, unless such facts are matters of common knowledge based on ordinary human experience or matters of which courts may take judicial notice."), overruled on other grounds, State v. Taylor, 669 So.2d 364 (La. 1996); State v. Jordan, 719 So. 2d 556, 563 (La. App. 4th Cir. 1998) (same).

Petitioner's third contention is that counsel was ineffective for failing to object when the prosecutor indicated in closing arguments that petitioner was a "serial child molester."[27] That contention clearly fails because it rests on a patently false premise. The transcript shows that neither of the two prosecutors made any such statement during the closing arguments.[28]

Petitioner's fourth contention is based on counsel's failure to object when the prosecutor purportedly elicited "false testimony" from the victim.[29] However, once again, petitioner did not meet his burden of proof. He failed even to identify the testimony which was purportedly false, much less make any effort whatsoever to establish that the testimony, whatever it may have been, was in fact false.

Petitioner's remaining contentions, namely the counsel was ineffective for failing to object when the prosecutor purportedly improperly vouched for the credibility of the detectives[30] and when the trial judge purportedly failed to instruct the jury as to the law applicable to the case,[31] are likewise proven false by a simple review of the transcript. The transcript does not reveal any

---

[27] Rec. Doc. 4, p. 28. Louisiana law provides:

> The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
> The argument shall not appeal to prejudice.
> The state's rebuttal shall be confined to answering the argument of the defendant.

La. Code Crim. P. art. 774.

[28] State Rec., Vol. 5 of 13, transcript of February 26, 2014, pp. 2-9 and 13-21.

[29] Due process may be violated if a prosecutor knowingly presents false testimony at trial or allows untrue testimony to go uncorrected. Giglio v. United States, 405 U.S. 150, 153 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959).

[30] Rec. Doc. 4, p. 29. See State v. Anthony, 266 So. 3d 415, 427 (La. App. 5th Cir. 2019) ("A prosecutor cannot vouch for the credibility of a witness or use the prestige of the District Attorney's Office to bolster its case.").

[31] Rec. Doc. 4, p. 29. See La. Code Crim. P. arts. 801(A) ("The court shall charge the jury after the presentation of all evidence and arguments.") and 802(1) ("The court shall charge the jury … [a]s to the law applicable to the case ….").
See also id. art. 801(C) ("A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of objection. The court shall give the party an opportunity to make the objection out of the presence of the jury.").

instance which could be construed as improper vouching.  Further, the transcript shows that the

trial judge in fact extensively instructed the jury on the law applicable to the case,[32] and petitioner

does not identify *any* specific respect in which those instructions were improper or inadequate.[33]

Because petitioner utterly failed to establish that any aspect of his ineffective assistance of

counsel claim had any merit whatsoever, there is simply no basis for this Court to find that the

state court decision denying that claim was contrary to, or involved an unreasonable application

of, clearly established federal law, as determined by the Supreme Court of the United States.

Accordingly, under the AEDPA's mandatory and doubly deferential standards of review

applicable to such claims, this Court should likewise deny the claim.

## B.  Double Jeopardy

Petitioner also claims:  "Mr. Baham was subjected to Double Jeopardy when he was

convicted of two Counts of LSA-R.S. 14:94 stemming from one underlying felony conviction for

Attempted Second Degree Murder."[34]

Petitioner first asserted that claim in the motion to vacate an illegal sentence he filed with

the state district court on or about February 12, 2018.[35]  The state district court denied that motion,

holding:

> The defendant now files a motion to vacate an illegal sentence, raising a
> double jeopardy issue.  He specifically directs the court to note that he is not
> labeling his pleading as one of post-conviction under the time limitations of LSA-
> C.Cr.P. art. 930.8 but rather a motion to vacate an illegal sentence which has no
> time limitations.
> It is true that the instant pleading is not labeled an application for post-
> conviction relief.  However, regardless of the caption of his pleading, by definition,
> the defendant seeks post-conviction relief.  An application for post-conviction relief

---

[32] State Rec., Vol. 5 of 13, transcript of February 26, 2014, pp. 22-36.
[33] <u>See</u> Rec. Doc. 4, p. 29.
[34] Rec. Doc. 4, p. 22.
[35] State Rec, Vol. 8 of 13.

is defined as "a petition filed by a person in custody after sentence following conviction for the commission of an offense seeking to have the conviction and sentence set aside." LSA-C.Cr.P. art. 924.

Post-conviction relief applications are subject to strict procedural requirements. In addition to time limitations, repetitive and successive applications are not permitted, under LSA-C.Cr.P. art. 930.4. The defendant has appealed and filed a previous application for post-conviction relief. Post-conviction statutes prohibit consideration of claims that were known but inexcusably not raised prior to conviction or that raise a new or different claim that was inexcusably omitted from a prior application. LSA-C.Cr.P. art. 930.4(B) and (E). [H]e is not entitled to bypass the bars against repetitive and successive applications.

Accordingly,

**IT IS ORDERED BY THE COURT** that defendant's motion be and is hereby **DENIED**.[36]

Petitioner then sought review of that ruling by the Louisiana Fifth Circuit Court of Appeal.

However, that court likewise denied relief, holding:

[W]e find that relator's motion to vacate an illegal sentence, which fails to point to an illegal term in his sentence, is more properly considered as an application for post-conviction relief. State v. Parker, 98-0256 (La. 05/08/98), 711 So.2d 694, 695. We further find that relator's application is successive and procedurally barred from review under La. C.Cr.P. art. 930.4. Accordingly, this writ application is denied.[37]

**Petitioner did not seek review of that judgment by filing a writ application with the Louisiana Supreme Court.**

As the United States Fifth Circuit Court of Appeals has explained: "Applicants seeking habeas relief under § 2254 are required to exhaust all claims in state court prior to requesting federal collateral relief. The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the *highest* state court." Mercadel v. Cain, 179 F.3d 271, 275 (5th Cir. 1999) (emphasis added). In Louisiana, the highest state court is the Louisiana Supreme Court. See La. Const. art. V, § 5(A). Because petitioner abandoned his double jeopardy

---

[36] State Rec., Vol. 8 of 13, Order dated February 21, 2018.
[37] State v. Baham, No. 18-KH-493 (La. App. 5th Cir. Oct. 15, 2018); State Rec., Vol. 11 of 13.

claim in the state courts before presenting it to the Louisiana Supreme Court, the claim is clearly unexhausted.

The Fifth Circuit has further held that "when a prisoner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred," then the claims are considered defaulted in federal court. Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997) (internal quotation marks omitted).

As the state correctly notes in its response in this proceeding, there is little doubt that any new attempt by petitioner to exhaust his double jeopardy claim would be rejected by the state courts on procedural grounds.[38] If he now tried to file a writ application with the Louisiana Supreme Court seeking review of the Louisiana Fifth Circuit Court of Appeal's above-quoted 2018 ruling, that writ application would obviously be dismissed as untimely. See Louisiana Supreme Court Rule X, § 5(a).[39] If he instead attempted to file an entirely new state application reasserting the double jeopardy claim, that application would be denied as both repetitive under La. Code

---

[38] See Rec. Doc. 12, pp. 17-18.
[39] That Rule states:

> An application seeking to review a judgment of the court of appeal either after an appeal to that court, or after that court has granted relief on an application for supervisory writs (but not when the court has merely granted an application for purposes of further consideration), or *after a denial of an application, shall be made within thirty days of the mailing of the notice of the original judgment of the court of appeal*; however, if a timely application for rehearing has been filed in the court of appeal in those instances where a rehearing is allowed, the application shall be made within thirty days of the mailing of the notice of denial of rehearing or the judgment on rehearing. *No extension of time therefor will be granted.*

Louisiana Supreme Court Rule X, § 5(a) (emphasis added).

Crim. P. article 930.4[40] and untimely under La. Code Crim. P. art. 930.8.[41]  In fact, in denying

petitioner's first post-conviction writ application, the Louisiana Supreme Court expressly stated:

> Relator has now fully litigated his application for post-conviction relief in state court.  Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana post-conviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4 and within the limitations period as set out in La.C.Cr.P. art. 930.8. Notably, the legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Relator's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final. Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, relator has exhausted his right to state collateral review. [42]

As a result, petitioner's double jeopardy claim is procedurally barred from federal review

unless he demonstrates either that (1) both "cause" exists for his default and "prejudice" would

result from the application of a procedural bar or (2) the Court's failure to address the claims would

result in a "fundamental miscarriage of justice."  See, e.g., Bagwell v. Dretke, 372 F.3d 748, 756-

57 (5th Cir. 2004).

"To establish cause for a procedural default, there must be something *external* to the

petitioner, something that cannot fairly be attributed to him."  Johnson v. Puckett, 176 F.3d 809,

816 (5th Cir. 1999) (quotation marks omitted).  Here, petitioner has made no effort whatsoever to

---

[40] In pertinent part, that article provides:

> B. If the application alleges a claim of which the petitioner had knowledge and inexcusably failed to raise in the proceedings leading to conviction, the court shall deny relief.
>
> ….
>
> D. A successive application shall be dismissed if it fails to raise a new or different claim.

La. Code Crim. P. article 930.4.

[41] Article 930.8 generally requires that a petitioner file his post-conviction within two years of the date on which his conviction and sentence became final.  Although there are exceptions provided in the article, those exceptions to do not appear to be applicable to petitioner's double jeopardy claim.

[42] State ex rel. Baham v. State, 254 So. 3d 683 (La. 2018); State Rec., Vol. 13 of 13.

establish cause for his default, and, "[a]bsent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice." Martin v. Maxey, 98 F.3d 844, 849 (5th Cir. 1996); accord Hughes v. Quarterman, 530 F.3d 336, 343 (5th Cir. 2008).

Because petitioner has not met the "cause and prejudice" test, his double jeopardy claim is barred from federal review unless the application of the procedural bar would result in a "fundamental miscarriage of justice." In order to establish that there would be a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him. Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." Finley v. Johnson, 243 F.3d 215, 220 (5th Cir. 2001) (citations omitted); accord Callins v. Johnson, 89 F.3d 210, 213 (5th Cir. 1996) ("This 'miscarriage of justice' exception is concerned with actual as compared to legal innocence, and the term 'actual innocence' means *factual*, as opposed to *legal*, innocence." (citations, quotation marks, and brackets omitted)); Johnson v. Hargett, 978 F.2d 855, 859-60 (5th Cir. 1992) ("The Supreme Court has made clear that the term 'actual innocence' means *factual*, as opposed to *legal*, innocence – 'legal' innocence, of course, would arise whenever a constitutional violation by itself requires reversal, whereas 'actual' innocence … means that the person did not commit the crime.").

To make that showing, "a petitioner must *supplement* a constitutional claim with a colorable showing of *factual* innocence." Callins, 89 F.3d at 213 (quotation marks and brackets omitted). The United States Supreme Court has explained that a petitioner is therefore required "to support his allegations of constitutional error with *new* reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority

of cases, claims of actual innocence are rarely successful." <u>Schlup v. Delo</u>, 513 U.S. 298, 324 (1995) (emphasis added). Here, petitioner has not even claimed in his federal application that he is actually innocent, much less presented any new evidence in support of such a claim.

For these reasons, petitioner's double jeopardy claim is procedurally barred and should not be considered by this Court.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Carl Baham be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[43]

New Orleans, Louisiana, this __13th__ day of October, 2020.

<u>Dana M. Douglas</u>
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**

---

[43] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.